IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
EASTERN DIVISION

DIANA WOODBURY and NORMAND
MARTINEAU,

    Plaintiffs,

v.                                               No. 11-1126

OBION COUNTY, TENNESSEE and DEPUTY
TYREE CALLENS, in his individual capacity,

    Defendants.

---

ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANT OBION COUNTY'S MOTION FOR SUMMARY JUDGMENT

---

*INTRODUCTION*

This lawsuit was brought by the Plaintiffs, Diana Woodbury and Normand Martineau, on May 13, 2011, alleging negligence, malicious prosecution, false imprisonment, false arrest, negligent infliction of emotional distress, and violation of their constitutional rights under the Fourth and Fourteenth Amendments pursuant to 42 U.S.C. § 1983. On July 30, 2012, the Defendants, Obion County, Tennessee and Deputy Tyree Callens, moved for summary judgment under Rule 56 of the Federal Rules of Civil Procedure. (D.E. 27.) In their reply to Plaintiffs' response to the motion, the Defendants withdrew their request for summary judgment as to Callens, conceding that there were issues of material fact concerning whether he was entitled to qualified immunity. Thus, the Court will only consider the Rule 56 motion as it pertains to Obion County.

*STANDARD OF REVIEW*

Rule 56 provides that the "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter

of law." Fed. R. Civ. P. 56(a). "In analyzing a motion for summary judgment, [courts are to] construe all evidence in the light most favorable to the non-moving party." Gecewicz v. Henry Ford Macomb Hosp. Corp., 683 F.3d 316, 321 (6th Cir. 2012) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)). "A fact is 'material' for purposes of summary judgment if proof of that fact would establish or refute an essential element of the cause of action or defense." Bruederle v. Louisville Metro Gov't, 687 F.3d 771, 776 (6th Cir. 2012). "The central issue is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Dugle ex rel. Dugle v. Norfolk S. Ry. Co., 683 F.3d 263, 267 (6th Cir. 2012) (citing Anderson, 477 U.S. at 251-52, 106 S. Ct. 2505) (internal quotation marks omitted), *reh'g & reh'g en banc denied* (Aug. 2, 2012). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." Planned Parenthood Sw. Ohio Region v. DeWine, ___ F.3d ___, 2012 WL 4490776, at *9 (6th Cir. Oct. 2, 2012) (quoting Anderson, 477 U.S. at 255, 106 S. Ct. 2505).

*FACTS*

In late February 2010, Mae Holt,[1] a local resident, called the Obion County Sheriff's Department from Florida to report that two motorcycles and a truck were possibly being taken without the owner's consent from a home at 1746 Brevard Road in Union City, Tennessee by Plaintiff Martineau, who she suspected had driven it to his residence in Canada. (D.E. 30-2 (Dep. of Tyree Callens) at 24.) Martineau lived in Montreal, Quebec and owned the house on Brevard

---

[1] This individual has been referred to in the parties' briefs and various exhibits as "Mae Holt Brown," "Mae Brown Holt" and "Mae Holt Gephart." As it is unclear to the Court which is correct, in the name of consistency she will be identified herein as "Mae Holt."

2

Road. (D.E. 30-2 at 25; D.E. 30-10 at 5; D.E. 1 ¶¶ 3-4, 7, 12.) Defendant Callens drove to the location and discovered that a rear door was open but no one was home. (D.E. 30-2 at 24.) He secured the house and requested that dispatch advise Holt. (Id. at 22, 24.) The truck was identified as a black 2005 Chevrolet. (Id. at 25.) Holt came to the sheriff's office on March 2, 2010 to complete an incident report. (Id. at 22.) That same day, Callens entered the truck as stolen in the National Crime Information Center ("NCIC") database. (Id. at 11.)

Obion County Chief Deputy Kent Treece looked through the incident reports on a daily basis and passed them to a clerk for entry into the department's computer system and for filing. (D.E. 30-6 (Dep. of Kent Treece) at 4.) He testified in his deposition that he saw nothing amiss with respect to the incident report filed by Callens. (Id.) Obion County Sheriff Jerry Vastbinder also read the incident report a day or two after it was taken. (D.E. 30-7 (Dep. of Jerry Vastbinder) at 3.)

In May 2010, Woodbury, who resided in South Lake Tahoe, California, and Martineau traveled to Obion County in the same 2005 truck. (D.E. 1 ¶¶ 3-4, 7.) On May 13, 2010, the Plaintiffs contacted the Obion County Sheriff's Department to report a theft of property from the Brevard Road residence. (Id. ¶ 12.) Deputy Mike Alford arrived on the scene and engaged in conversation with the Plaintiffs. (D.E. 27-4 (Decl. of Tyree Callens) ¶ 5.) A black Silverado truck was parked on the premises. (Id.) A check of the vehicle identification number ("VIN") in the NCIC database revealed that the truck had been reported stolen. (Id. ¶ 6.) Plaintiffs were arrested and transported to the Obion County Jail. (Id. ¶ 9.) The charges were ultimately dismissed. (D.E. 30-7 at 57.)

According to Martineau's deposition, he purchased the truck in 2005 in Holt's name for business purposes, as she was at that time the American agent for his company. (D.E. 30-3 (Dep.

3

of Normand Martineau Vol. 2) at 5-6, 30-8 (Dep. of Normand Martineau Vol. 1) at 3-6.) Her name appeared on the title. (D.E. 30-3 at 5-6.) In 2007, he asked her to transfer the title by signing the back of the document because he "want to have a control of my, of my goods."[2] (Id. at 6-7.) The assignment of title, a copy of which was submitted to the Court, reflected Holt as seller of the vehicle and Woodbury as the buyer. (D.E. 30-7 at 32.) Martineau gave Woodbury possession of the vehicle in late February 2010. (D.E. 30-3 at 3.)

Shortly after Holt's stolen vehicle report was made, Martineau was at the Brevard Road house, where he was residing at the time, loading his belongings into a truck intending to transport them to Woodbury's office in California. (Id. at 9, 13.) Callens appeared with his hand on his gun and asked what was going on and what he was doing on the premises. (Id.) When Martineau explained that it was his house, Callens was skeptical. (Id.) Martineau produced the deed, which was in the name of Martineau and his company. (Id. at 10.) Callens then asked about the truck and two motorcycles parked in the garage. (Id.) The title to one motorcycle bore Martineau's name, while the other was in Holt's, with her signature on the back. (Id.) Martineau also showed Callens the truck title bearing her signature on the reverse side. (Id. at 10-11.) He explained to the deputy that the truck had been transferred to Woodbury and that he was leaving for California in order to move some items to her premises. (Id. at 11.) Martineau offered the following testimony in his deposition:

> And he [(Callens)] said: Yeah, but I am not so sure it's her signature. I said: I mean, you can see other document with her signature if you want to. But I don't see why

---

[2]According to the briefs, Martineau is French-Canadian. In reviewing his deposition testimony, it appears to the Court that he has some difficulty with spoken English. In order to eliminate distraction and maintain the integrity and meaning of the testimony, the Court will quote his statements without grammatical alteration.

4

> I would debate a situation like that with the police who decide to check on me. And he tried to intimidate me. He tried to -- no. First of all, he spoke to somebody over the phone, and he said he received a call from Mae Holt, all right, ordering me to don't use the truck. I said: She's my employee. When she order me to do what? All right. And he didn't understand that. He spoke for at least an hour in my driveway supposedly to Mae Holt, who she was in Florida, who was supposed to be in Tennessee in early January 2010 to go exactly to the bank and get the title of the coach, of the RV. And she stood me up. She never show up. And what happened, he said -- he tried to intimidate me. He said: Truck don't need to move from your premises, from that house. I said: Which owner. And after that he talk again over the phone with Mae Holt Brown. And after that he came to see me and he said: You'd better to take an attorney, or consult an attorney. That means -- and I said, I said: I will do so. And I went out with my business to drove back, everything was packed, to drove back to Tahoe.
>
> \* \* \*
>
> He said to me that Mae Holt request him to don't move the truck from the premises and intimidate me to said I would not have the right to drive the truck. And in the total end before he left he said: You better consult an attorney.

(Id. at 11-13.) In his deposition, Callens could not remember the confrontation with Martineau.

(D.E. 30-2 at 6-7.)

In a preliminary hearing on June 15, 2010 in the state criminal matter, Callens[3] testified in connection with Holt's report of a stolen truck thusly:

> She stated to me that her . . . she had a business partner and he so happened to take the truck off the property, which was in her name, titled in her name and all that, and she gave me a document here stating that she . . . that uh . . . she had certified that way Mr. Martineau take the truck to Canada back and forth for business purposes.

(D.E. 30-7 at 36.) The document to which Callens referred stated as follows:

> To whom it concerns, this document is to verify the fact that Mae Brown Holt holds all rights of ownership and privileges of the vehicle, a 2005 Chevrolet Silverado VIN#1GCHK29345E214738  I (Mae B. Holt) will relay these privileges to Diana Woodbury, who resides in South Lake Tahoe, California, USA.

---

[3]The transcript identifies Callens as "Deputy Tyree Cowans."

(Id. at 34, 37.) The document, dated September 8, 2008, was signed by Mae Brown Holt and notarized. (Id. at 34.) Vastbinder testified in his deposition that, if an officer had the document in his possession, it would have "tainted the probable cause." (Id. at 15-16.)

When he responded to the May 13, 2010 theft of property call on Brevard Road, Callens ran a NCIC search on the truck and found that the truck was listed as stolen. (D.E. 27-4 ¶¶ 4,6.) Woodbury claimed the truck belonged to her and produced insurance documentation, which Callens determined insufficient to doubt the validity of the NCIC entry. (Id. ¶¶ 7-8.) Because the NCIC entry provided probable cause, Callens insisted, he and Alford arrested the Plaintiffs. (Id. ¶ 9.)

In his deposition, Callens acknowledged understanding that, after he entered the truck into NCIC, anytime he ran its VIN through the database, the truck would come up stolen based on the information he had provided. (D.E. 30-2 at 11.) The following testimony was adduced with respect to the NCIC entry:

> Q: If you had known that -- if you had had the registration of the vehicle in Woodbury's name, the proof of insurance in Woodbury's name, the plates in Woodbury's name, the fact that they [Plaintiffs] had called the police -- called the sheriff's department out there, the fact that Mr. [Martineau] owned that house, would you still have arrested them?
>
> A: According to my report, what information I got, the VIN come back stolen.
>
> Q: If you had had all that information, you still would have arrested them is what you're telling me, isn't it?
>
> A: According to what my report says, the VIN number I entered, yes.
>
> \* \* \*
>
> Q: You now know that the truck didn't belong to Mae Holt?
>
> A: Now I know.
>
> Q: But what you're telling me there wasn't any way, no matter what documents

>
> they had, no matter what they had --
>
> A: There was no proof at the time.
>
> \* \* \*
>
> Q: But you said if you had the registration you would have arrested them. You said if you had the plates, if you had the proof of insurance, if you had everything, you still would have arrested them.
>
> \* \* \*
>
> A: I entered the vehicle in the NCIC as being stolen.

(Id. at 13-15.) When he arrived at the Brevard Road house on May 13, 2010, the Defendant deputy claimed to have had no idea why Alford was already there and did not ask him. (Id. at 15-16.) When queried as to whether the decision to make the arrest was his own, Callens stated that he "advised [his] superiors of what the situation was" by cell phone. (Id. at 16.) He could not recall with whom he spoke -- either Vastbinder or Treece. (Id.) He remembered that he was told "[s]ince we entered the vehicle in NCIC, it's reported stolen." (Id. at 17.) At the time of his deposition, Callens could not recall why he made the phone call. (Id.)

Treece testified in his deposition that he received a phone call at home on the day of the arrest from Alford or Callens explaining that the truck reported stolen had been located. (D.E. 30-6 at 5.) He stated that

> Ms. Woodbury, I think, had made an allegation that she actually owned the vehicle, and it was supposed to be titled and registered or something in California. It was outside of Tennessee, but she didn't have any proof of it at the time. And based on the information I got from whichever one of the officers that I talked to, I knew that Ms. Holt had reported it stolen, and she had produced what appeared to be a legitimate Tennessee title to that vehicle in her name. And I knew the vehicle had been entered into NCIC, which is National Crime Information Center, and it was entered as a stolen vehicle. And, there again, not being there to see and hear everything that was going on, my assumption would be -- and I don't like assuming. If I had the information from them that Ms. Holt had provided a title and they had

7

> done the report and it was entered in NCIC, then I would tell them to base their decision on the information that they have. And I'm almost certain that's what I told them. You know, you only know what you only know. And, thusly, I mean, I realized that they made an arrest and the vehicle was recovered.

(Id. at 5-6.) He insisted the probable cause determination was made not by him but by the officer at the scene. (Id. at 6-7.) When asked, "[h]ad there been a California license plate and had the property been at Mr. Martineau's home and had there been documentation that she owned the truck and they had called the police over themselves, there really wouldn't have been probable cause, would there?," Treece responded, "I think if that had been the circumstances, it would still warrant a little further investigation . . before [he] made a determination to put somebody in jail . . ." (Id. at 8.)

Vastbinder received a phone call from an insurance company representative subsequent to the theft report and prior to the Plaintiff's arrest concerning whether to pay a claim filed by Holt for the truck. (D.E. 30-7 at 24.) The sheriff informed him that the investigation into the truck's disappearance was ongoing and that he would hold up on making payment. (Id.) He explained that it was believed the truck would show up at the Canadian border when Martineau attempted to go through customs and at that point it would be retrieved. (Id. at 25.)

Vastbinder was contacted by phone shortly after the arrest and told that officers had recovered a vehicle and two subjects in possession thereof. (Id. at 5-6.) He could not recall who notified him. (Id. at 6.) The sheriff was advised that the truck had been located at Martineau's home, that it bore California plates in Woodbury's name and that she had documents indicating she owed the vehicle. (Id.) He conceded that there was nothing improper about a person signing over a title in Tennessee to another and that individual going to another state to obtain license plates and retitle the vehicle. (Id. at 6-7.) He knew the truck was run through the NCIC database and came

8

back as stolen. (Id. at 7.) It was his opinion that, if the officers on the scene were aware of the September 8, 2008 document, it "would have tainted the probable cause." (Id. at 15-16.)

In his deposition, Alford pointed out that the registration provided by the Plaintiffs had been obtained after the truck was reported stolen. (D.E. 30-4 (Dep. of Michael Alford) at 8.) He also related that the decision to arrest was made jointly by him and Callens. (Id. at 11.) According to Alford, the standard procedure to be followed when an officer is confronted with one party who reports a vehicle stolen and another party who says it is not stolen and shows registration is to contact the district attorney's office. (Id. at 13-14.) He did not know whether that was done in this case. (Id. at 14.) He acknowledged that there was nothing Woodbury could have done on the day of her arrest to avoid the outcome other than to have been in possession of the title to the truck, which, he conceded, she was not required to do. (Id. at 19-20.)

When he returned to Tennessee in May 2010, Martineau recalled that he first attempted to locate Holt. (D.E. 30-3 at 14.) The following day, he went to the Brevard Road house and discovered that one of his motorcycles, appliances and various belongings were missing and that the outdoor plants had been dug up. (Id. at 14-15.) He called the sheriff's office. (Id. at 15.) Alford arrived and asked, "You are the one who was married to Mae Holt Brown who was living here?" (Id.)

> I said: No, I was never married to Mae Holt Brown. She's my employee. And I said: That truck is stolen. I said: I didn't call you for that, I call you because I got property stolen and I was vandalized in there. And he said: I need to take the serial numbers on the truck, and he start to press and ask the registration of Diana, the insurance of Diana. And I said: All right. She give him everything she got. And he spoke over the phone to somebody for a while. And in the meantime, Tyree Callens show up, and I recognize him because it was the second time. I said: You know what this was about because all the paperwork, all the document -- and matter of fact, Diana kept a copy of the Exhibit 1 in the truck, and did show that to Mike Alford. At that point, Mike was doing all the work of the arrest here. But Tyree

9

>   didn't interfere with anything. And I told him, I said: What's going on, Tyree? You know I was going to California. He know I was coming back with it. He knows everything about it. And he didn't talk.

(Id. at 15-16.)

In her deposition, Woodbury stated that Alford asked her for the title to the truck and she informed him that it was in her safe deposit box in California, where the vehicle was registered. (D.E. 30-5 (Dep. of Diana Woodbury) at 5.) She recalled that, during the encounter, Alford was on the telephone in his vehicle for some time. (Id. at 6.) Indeed, the Defendants do not dispute that Alford consulted with Treece prior to the arrest. (D.E. 35 at 11.) According to the Plaintiff, the September 8, 2008 document signed by Holt was confiscated by Alford at the time of the arrest. (D.E. 30-10 at 9.)

## POSITIONS OF THE PARTIES AND ANALYSIS

Federal Claims.

At the outset, the Court deems it necessary to discuss some apparent confusion as to the scope of the summary judgment motion. Although the movants request relief under Rule 56 on all issues in this matter, they only address, as Plaintiffs point out in their response, claims involving the arrest, and not the allegations regarding seizure of the truck and other items of personal property. While Obion County filed a reply, it made no mention of the Plaintiffs' characterization of the motion as one for "partial" summary judgment. The complaint does appear to seek redress in the section alleging constitutional violations under § 1983 for the seizure of property. (D.E. 1 ¶ 64.) Therefore, the Court assumes that the motion for summary judgment is one for partial relief and that Obion County does not therein move for summary disposition of Plaintiffs' claims regarding seizure of property.

A municipality or local government may be found liable under § 1983 "if the governmental body itself subjects a person to a deprivation of rights or causes a person to be subjected to such deprivation." Connick v. Thompson, ___ U.S. ___, 131 S. Ct. 1350, 1359, 179 L. Ed. 2d 417 (2011) (internal quotation marks omitted). However, municipalities may only be held liable for "their own illegal acts," not the wrongful actions of their employees. Id. (emphasis omitted). A § 1983 plaintiff must demonstrate that "action pursuant to official municipal policy" caused his or her injury. Id. "Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." Id.

In this case, the Plaintiffs have alleged that Obion County failed to properly train its employees on the proper use of NCIC in determining probable cause. The Plaintiffs proffer in support of their claim against the municipality an excerpt from the NCIC operating manual which states that "[a]n NCIC 2000 hit alone is not probable cause to arrest, but indicates that a stolen property report, missing person report, or warrant, etc may have been filed. A hit is only one element comprising sufficient legal grounds for probable cause to arrest." (D.E. 30-11 at 10 (NCIC 2000 Operating Manual).)

As the United States Supreme Court explained in Connick,

> [i]n limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983. A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train. To satisfy the statute, a municipality's failure to train its employees in a relevant respect must amount to deliberate indifference to the rights of persons with whom the untrained employees come into contact. Only then can such a shortcoming be properly thought of as a city policy or custom that is actionable under § 1983.

11

> Deliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action. Thus, when city policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights, the city may be deemed deliberately indifferent if the policymakers choose to retain that program. The city's policy of inaction in light of notice that its program will cause constitutional violations is the functional equivalent of a decision by the city itself to violate the Constitution. A less stringent standard of fault for a failure-to-train claim would result in de facto respondeat superior liability on municipalities.
>
> A pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train. Policymakers' continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action -- the deliberate indifference -- necessary to trigger municipal liability. Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights.

Id. at 1359-60 (internal citations & quotation marks omitted).

Plaintiffs have made no showing that the municipal defendant was on notice of a pattern of incidents similar to the one that occurred in this case. Thus, liability may not attach to Obion County based on a failure to train its officers.

The Plaintiffs have also alleged that Obion County had a policy of disregarding the totality of the circumstances when making arrests. However, as they have offered no evidence whatever that similar activities have taken place in the past, they are attempting to infer a countywide policy based solely on one instance of alleged misconduct. As the Sixth Circuit recognized in Thomas v. City of Chattanooga, 398 F.3d 426 (6th Cir.), *cert. denied*, 546 U.S. 814, 126 S. Ct. 338, 163 L. Ed. 2d 50 (2005), "[t]his argument, taken to its logical end, would result in the collapsing of the municipal liability standard into a simple *respondeat superior* standard," which has been rejected by the courts. Thomas, 398 F.3d at 432-33.

It is further argued by the Plaintiffs that Obion County's highest ranking law enforcement officers ratified the decision of Alford and Callens to arrest them. "[A] subordinate's decision may support municipal liability if ratified by an authorized policymaker. Lentz v. City of Cleveland, 333 F. App'x 42, 47 (6th Cir. 2009). "[E]ven if the allegedly unconstitutional decision is initially made by a subordinate official, when that decision is appealed to and affirmed by an official with final authority over a matter, the municipality may be held liable for this affirmance." Arendale v. City of Memphis, 519 F.3d 587, 602 (6th Cir. 2008), *reh'g & reh'g en banc denied* (July 31, 2008). "Whether an official has such final authority is a question of state law." Baar v. Jefferson Cnty. Bd. of Educ., 476 F. App'x 621, 637 (6th Cir. 2012) (quoting Adkins v. Bd. of Educ. of Magoffin Cnty., Ky., 982 F.2d 952, 957 (6th Cir. 1993)). "Officials can derive their authority to make final policy from customs or legislative enactments, or such authority can be delegated to them by other officials who have final policymaking authority." Feliciano v. City of Cleveland, 988 F.2d 649, 655 (6th Cir.) (citing Pembaur v. City of Cincinnati, 475 U.S. 469, 483, 106 S. Ct. 1292, 1300, 89 L. Ed. 2d 452 (1986)), *cert. denied* 510 U.S. 826, 114 S. Ct. 90, 126 L. Ed. 2d 57 (1993). "This includes state and local positive law, such as statutes, ordinances, and regulations, and less formal sources of law such as local practice and custom." Id. (citing Jett v. Dallas Indep. Sch. Dist., 491 U.S. 701, 737, 109 S. Ct. 2702, 2723, 105 L. Ed. 2d 598 (1989)) (internal quotation marks omitted), *see also* Monistere v. City of Memphis, 115 F. App'x 845, 852 (6th Cir. 2004) (same).

However, "mere acquiescence in a single discretionary decision by a subordinate is not sufficient to show ratification." Feliciano, 988 F.2d at 656, *see also* Arnold v. City of Columbus, No. 2:08-cv-0031, 2011 WL 1303593, at *26 (S.D. Ohio Mar. 31, 2011) (same). "Ratification of a subordinate's action requires more than acquiescence -- it requires affirmative approval of a

13

particular decision made by a subordinate." Feliciano, 988 F.2d at 656. A plaintiff "must offer proof that an official charged with making final policy regarding [the subject matter] expressly approved [the subordinate's] actions." Id.

According to the testimony, one of the officers spoke with Treece prior to arresting the Plaintiffs. Treece's deposition testimony, which is uncontroverted, reflects that he knew at the time of the call that the truck had been reported stolen and that Woodbury had presented to the officers no documentary proof of ownership. While there were other circumstances that suggested probable cause to arrest did not in fact exist, there is nothing to indicate *he* was aware of those circumstances until after the arrest had occurred. "[L]aw enforcement is under no obligation to give any credence to a suspect's story or alibi nor should a plausible explanation in any sense require the officer to forego arrest pending further investigation if the facts as initially discovered provided probable cause." Ahlers v. Schebil, 188 F.3d 365, 371 (6th Cir. 1999) (internal quotation marks omitted). The Sixth Circuit has held that an NCIC entry reflecting a vehicle is stolen constitutes probable cause to arrest the possessor thereof. *See* United States v. Davis, 568 F.2d 514, 516 (6th Cir. 1978); Palmer v. Town of Jonesborough, No. 2:08-cv-345, 2009 WL 1255780, at *6-7 (E.D. Tenn. May 1, 2009). Thus, the motion for summary judgment by Obion County as to Plaintiffs' federal claim with respect to the arrest is GRANTED.

State Law Claims.

Obion County seeks dismissal of Plaintiffs' claims under the Tennessee Governmental Tort Liability Act ("GTLA"), which governs state law claims against governmental entities and their employees. *See* Tenn. Code Ann. § 29-20-101, *et seq*. GTLA claims would ordinarily confer supplemental jurisdiction in this Court because they arise out of the same facts and form part of the

same case or controversy. *See* 28 U.S.C. § 1367(a). However, these allegations must be brought in "strict compliance" with the terms of the state statute. *See* Tenn. Code Ann. § 29-20-201(c). The GTLA expressly states that Tennessee "circuit courts shall have exclusive original jurisdiction" over claims brought pursuant to its provisions. Tenn. Code Ann. § 29-20-307.

A district court may, in its discretion, decline supplemental jurisdiction over a state law claim even if jurisdiction would otherwise be proper under § 1367(a). Section 1367(c)(4) allows a district court to "decline to exercise supplemental jurisdiction over a claim under subsection (a) if . . . (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction." 28 U.S.C. § 1367(c)(4). The Sixth Circuit has held that "the Tennessee legislature expressed a clear preference that [GTLA] claims be handled by its own state courts. This unequivocal preference of the Tennessee legislature is an exceptional circumstance [under § 1367(c)(4)] for declining jurisdiction." Gregory v. Shelby Cnty., Tenn., 220 F.3d 433, 446 (6th Cir. 2000). Therefore, this Court declines to exercise supplemental jurisdiction over Plaintiffs' GTLA claims. *See* Ables v. Shelby Cnty., Tenn., No. 2:10-CV-02169-JPM-dkv, 2010 WL 3024959, at *5 (W.D. Tenn. July 29, 2010) (state law claims dismissed in light of Sixth Circuit's finding that Tennessee legislature's preference that GTLA claims be addressed in state courts was an exceptional circumstance under § 1327(c)(4) supporting order declining jurisdiction). The Plaintiffs' GTLA claims are DISMISSED without prejudice.[4]

In their response to the dispositive motion, the Plaintiffs assert that, the GTLA notwithstanding, they may nonetheless bring their state law claims of malicious prosecution and

---

[4] The Plaintiffs conceded in their response to the motion for summary judgment that some of their GTLA claims lacked merit. As the Court has dismissed the GTLA claims on exclusivity grounds, it need not consider the efficacy of the remaining claims under the statute.

15

false arrest against Obion County pursuant to Tennessee Code Annotated § 8-8-302, which provides that

> [a]nyone incurring any wrong, injury, loss, damage or expense resulting from any act or failure to act on the part of any deputy appointed by the sheriff may bring suit against the county in which the sheriff serves; provided, that the deputy is, at the time of such occurrence, acting by virtue of or under color of the office.

In reply, Obion County argues solely that any claims under § 8-8-302 must be dismissed based on Plaintiffs' failure to assert a cause of action under the statute in their complaint. Indeed, the Plaintiffs did not make reference to any state statute in their complaint. There is, however, "no Tennessee authority [that] requires the statute [upon which the plaintiff bases his or her claim] to be expressly cited within the body of the complaint." Black v. City of Memphis, ___ F. App'x ___, 2000 WL 687683, at *4 (6th Cir. May 19, 2000) (per curiam). Consequently, the Defendant's request for dismissal of the § 8-8-302 claims on the grounds that they were not alleged in the complaint is DENIED. As Obion County has offered no argument with regard thereto, the Court will not address the merits of such claims.

*CONCLUSION*

In sum, the Defendants' motion for summary judgment is GRANTED as to the Plaintiffs' federal claims concerning their arrests. Obion County's request for dismissal of Plaintiffs' claims under Tennessee Code Annotated § 8-8-302 is DENIED. Plaintiffs' state law claims under the GTLA are DISMISSED.

IT IS SO ORDERED this 25th day of October 2012.

s/ J. DANIEL BREEN
UNITED STATES DISTRICT JUDGE